2018V00204/KR/jw

CRAIG CARPENITO
United States Attorney
By:  Kathleen Robeson
Special Assistant United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
Tel:  (973) 645-2700
Fax: (973) 297-2042
Kathleen.Robeson2@usdoj.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Hon.** |
| **v.** | |
| | **Civil Action No.** |
| **$219,750 IN UNITED STATES CURRENCY;** | |
| | **VERIFIED COMPLAINT FOR FORFEITURE _IN REM_** |
| **ONE LADIES' 18K WHITE GOLD NAIL DESIGN "JUSTE UN CLOU" DIAMOND BRACELET BY CARTIER, SERIAL NO. ANM732;** | |
| **ONE 18K LADIES' WHITE GOLD CARTIER "LOVE BRACELET," SERIAL NO. B60448016;** | |
| **ONE LADIES' 18K WHITE GOLD CARTIER "LOVE RING," SERIAL NO. B483400;** | |
| **ONE 18K GOLD "ROYAL OAK" AUDEMARS PIGUET WATCH, SERIAL NO. 15451OR.ZZ.1256OR.01;** | |

**ONE LADIES' STAINLESS STEEL "ROYAL OAK OFFSHORE" AUDEMARS PIGUET WATCH, SERIAL NO. 26048SK.ZZ.D002CA.01; and**

**ONE 2015 MERCEDES-BENZ G63 AMG, VIN WDCYCDF7FX238360,**

> ***Defendants in rem.***

- - - - - - - - - - - - - - - - - - - - - -x

Plaintiff the United States of America, by its attorney, Craig Carpenito, United States Attorney for the District of New Jersey, for its verified complaint (the "Complaint") alleges, upon information and belief, as follows:

## I. <u>NATURE OF THE ACTION</u>

1. This action is brought by the United States of America seeking the forfeiture of the following property:

    (a)    $219,750 in United States Currency seized on or about December 21, 2017 from Safe Deposit Box No. 04223 at a Wells Fargo branch in Beverly Hills, California (the "defendant currency");

    (b)    Jewelry and watches seized on or about December 21, 2017 from Safe Deposit Box No. 04223 at a Wells Fargo branch in Beverly Hills, California (the "defendant jewelry"), to wit:

        i.    $219,750 in United States Currency;

       ii.    One Ladies' 18k white gold nail design "Juste un Clou" diamond bracelet by Cartier, Serial No. ANM732;

      iii.    One 18k Ladies' white gold Cartier "Love Bracelet," Serial No. B60448016;

-2-

    iv.   One Ladies' 18k white gold Cartier "Love Ring," Serial No. B483400;

    v.   One 18k gold "Royal Oak" Audemars Piguet watch, Serial No. 15451OR.ZZ.1256OR.01; and

    vi.   One Ladies' stainless steel "Royal Oak Offshore" Audemars Piguet watch, Serial No. 26048SK.ZZ.D002CA.01; and

    (c)   One 2015 Mercedes-Benz G63 AMG, VIN WDCYCDF7FX238360 (the "defendant vehicle");

(hereinafter referred to collectively as the "defendants in rem" or the "defendant property").

2.    The defendants in rem are subject to seizure and forfeiture to the United States of America pursuant to 21 U.S.C. § 881(a)(6), which subjects to forfeiture all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of Title 21, Subchapter I, of the United States Code; all proceeds traceable to such an exchange; and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of Title 21, Subchapter I, of the United States Code.

## II.  JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355(a).

4.    Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the District of New Jersey.

5.      The defendant currency is being held on deposit in the United States Marshals Service ("USMS") Seized Asset Deposit Fund at the Federal Reserve Bank.  The defendant jewelry and the defendant vehicle are in the constructive custody of the USMS.  A USMS contractor in Pflugerville, Texas is holding the defendant jewelry.  The defendant vehicle is in the custody of a USMS contractor in or around Chino, California.

### III. <u>OVERVIEW OF THE CRIMINAL SCHEME</u>

6.      Fentanyl is a powerful synthetic opioid analgesic that is similar to morphine but is 50 to 100 times more potent.  A Schedule II controlled substance, fentanyl carries a high risk for addiction and overdose.  Cyclopropyl fentanyl, an analogue of fentanyl, is a Schedule I controlled substance.  Where this affidavit uses the term "fentanyl," it refers to both fentanyl and its analogues, including cyclopropyl fentanyl.

### A. Summary of Investigation

7.      On or about August 30, 2017, law enforcement officers in New Jersey executed a search warrant at a residence in Middletown, New Jersey, that was being utilized as a "stash house" and distribution center for controlled substances (the "stash house").  Law enforcement seized approximately 300,000 pills as well as packaging and mailing materials used for distribution. A U.S. Drug Enforcement Administration ("DEA") laboratory subsequently determined that approximately 123,084 pills seized from the stash house contained over 9 kilograms of cyclopropyl fentanyl.

8.    The operator of the stash house (the "CS") agreed to cooperate and told law enforcement that a person known to the CS only as "Blue Man" or "Blue" had supplied to the CS all of the fentanyl pills at the stash house.

9.    The CS said that he/she had purchased hundreds of thousands of fentanyl pills from "Blue Man" or "Blue."  Law enforcement subsequently identified this supplier as Andrew Tablack.

10.    According to the CS, the CS first purchased fentanyl from Tablack on the dark web marketplace AlphaBay.  After their initial contacts through AlphaBay, the CS and Tablack began exchanging encrypted text messages on a self-destructive timed platform.  The CS and Tablack arranged sales and shipments of fentanyl through the United States mail.  The CS provided Tablack with delivery addresses in New Jersey for the shipments and made payments to Tablack on the internet using a Bitcoin wallet.

11.    On or about September 7, 2017, at the direction of law enforcement, the CS communicated with Tablack to arrange for the shipment of approximately 500,000 fentanyl pills.

12.    Before the CS could provide Tablack with delivery addresses for the shipment, on or about September 8, 2017, Tablack texted the CS the tracking information for a parcel shipped from California and destined for Worcester, Massachusetts (the "Worcester parcel").  The CS inquired about this tracking number, and Tablack explained over text messages that he had sent the CS that tracking number by mistake.  Tablack had shipped the package

corresponding to that tracking number, which contained approximately 30,000 fentanyl pills, to a different customer of Tablack's in Worcester, Massachusetts.

13.     On or about September 11, 2017, law enforcement intercepted and searched the Worcester parcel.  The parcel contained a large vacuum-sealed plastic bag weighing approximately 3.221 kilograms.  A DEA laboratory determined that the bag held approximately 29,141 pills containing more than three kilograms of cyclopropyl fentanyl.

14.     On or about September 9, 2017, the CS provided Tablack with six potential delivery addresses.  On or about September 11, 2017, Tablack texted the CS a link to an encrypted webpage that displayed three postal tracking numbers for three separate parcels that Tablack had shipped to New Jersey (the "New Jersey parcels").  This information confirmed that Tablack had shipped the New Jersey parcels to three of the six delivery addresses the CS provided to Tablack.

15.     Tablack relayed to the CS that he had shipped 200,000 fentanyl pills in the New Jersey parcels to delivery addresses provided by the CS.  Tablack told the CS that two of the parcels contained 75,000 fentanyl pills and the third contained 50,000 fentanyl pills.

16.     On or about September 13, 2017, law enforcement intercepted the New Jersey parcels, which contained about 200,000 small blue pills in Mylar plastic bags.  The DEA laboratory subsequently determined that the three packages together held approximately 226,520 pills containing nearly 20 kilograms of cyclopropyl fentanyl.

17.     On or about September 16, 2017, the CS texted Tablack that the CS's "tdp 5" pill press machines had broken, and asked Tablack what machine he was using.  Tablack responded that he had purchased a "ZP-9" machine, which (according to Tablack) was worth between $6,000 and $7,000, from a company called Shanghai Machinery.

18.     On or about September 20, 2017, Tablack texted the CS a Bitcoin address so that the CS could transfer bitcoin to Tablack in payment for past purchases of fentanyl.  Subsequent blockchain analysis of that address led to another bitcoin address registered to a user with an email account registered to Tablack.

19.     Subsequently, in December 2017, law enforcement intercepted and opened a parcel from Shanghai Tianhe Machinery addressed to a UPS mailbox in Beverly Hills used by Tablack (see paragraph 27 below).  The parcel contained two metal stamping dies used to stamp pills during the manufacturing process.

20.     On or about October 4, 2017, in a text exchange with the CS, Tablack admitted that he had no legal employment and was focusing exclusively on his drug manufacturing and distribution operation.

21.     On or about October 8, 2017, Tablack informed the CS via text that he would be visiting New York City.  In response, the CS suggested that the CS personally drop off a payment to Tablack in New York.

22.     On or about October 9, 2017, Tablack texted the CS that his flight would arrive at approximately 10:00 p.m. on Wednesday, October 11, 2017.

On or about October 12, 2017, Tablack texted to confirm his arrival.  Tablack and the CS subsequently made plans to meet in person at the Trump SoHo New York, where Tablack was staying (the "Hotel").  Hotel records confirmed Tablack's reservation and registration at the Hotel.

23.     At approximately 8:00 p.m. on or about October 12, 2017, Tablack and the CS met in person at the Hotel.  The conversation was consensually recorded, and law enforcement maintained surveillance outside the Hotel and in the lobby bar.

24.     According to the CS, Tablack spoke about his past transactions with the CS, including the Worcester parcel and the New Jersey parcels, and future business dealings.  Tablack proposed that the CS serve as Tablack's distributor for large quantities of marijuana that Tablack would ship from California to New Jersey.  Tablack also discussed his drug manufacturing and distribution operation, informing the CS that he and a worker he employs operate multiple high-capacity pill press machines and ship fentanyl pills all over the country.  Tablack also mentioned that he had recently purchased two new pill press machines.

25.     On or about October 13, 2017, Tablack texted the CS a Bitcoin wallet address so that the CS could transfer funds to Tablack in payment for past purchases of fentanyl.

**B.     A Source of Supply**

26.     On or about May 22, 2017, the DEA received information from China's Ministry of Public Security, Narcotics Control Bureau, identifying individuals in the United States who had ordered fentanyl from a laboratory based in Wuhan, China.  The operators of the laboratory had been labeling fentanyl as food additives and then shipping the fentanyl overseas.  The investigation identified Tablack as one of the laboratory's clients who had ordered fentanyl.

27.     Tablack utilized a UPS Store mailbox in Beverly Hills, California (the "UPS Mailbox") to received mail under both his own name and the entity "Russuk LLC."

28.     On or about June 9, 2017, U.S. Customs and Border Protection seized a parcel purportedly containing beauty products that had been shipped by "Billy Cheuk, Flat F 8/f Tower 2, Century Gateway, Hong Kong" to "Russuk LLC, 324 S. Beverly Dr., #520, Beverly Hills, CA 90212" (the "Cheuk parcel"). The delivery address in Beverly Hills was the UPS Mailbox.  The Cheuk parcel contained approximately 527 grams of cyclopropyl fentanyl.  Tablack received 25 parcels from China and Hong Kong at the UPS Mailbox from in or around August 2016 to as recently as December 6, 2017.

29.     Tablack had an account with eBay, an online marketplace, that listed a shipping address for Russuk LLC as a location in Van Nuys, California, 91405-1090 (the "Van Nuys address").  Tablack also purchased nine pill press machines, which cost between $1,300 and $1,650 each, between on or about

February 9, 2017 and on or about August 30, 2017.  He ordered six of the nine

pill press machines on or about August 30, 2017.  Using eBay, Tablack also

purchased laboratory-grade sodium saccharin powder, a substance that may

be used in pressing fentanyl pills, and a compensator used to stabilize the

recoil and movement of a firearm.

**C.     Tablack's Drug Sales from His AlphaBay Store**

30.     Among other methods, Tablack sold illegal drugs using the online

marketplace AlphaBay.  Between about July 23, 2016 and about March 20,

2017, Tablack placed approximately 23 advertisements for illegal narcotics on

the web page for his AlphaBay store.  A typical ad advertised the sale of "bulk"

amounts of the prescription drugs Adderall, Xanax, and oxycodone.

31.     Sales of Adderall, Xanax, and oxycodone are regulated by the DEA.

Adderall is a central nervous system stimulant and a Schedule II controlled

substance.  Xanax is the brand name for alprazolam, a Schedule IV controlled

substance.  Oxycodone is a Schedule II controlled substance.

32.     Tablack's advertisements indicated that he was able to sell large

amounts of narcotics, as evidenced by this example of one of his ads:

> Full Escrow - Oxycodone 30MG pressed with Real Pure
> Fentanyl 0.8 MG which is equal 100MG OXY as active
> substance.
>
> I am very experienced in what i do for all my products.
> they break like the real ones. Both color and print are on
> point.
>
> dosage on point always.
>
> it can be used IV - oral - smoke - snorted
> USA domestic shipping only

I am able to offer pricing below because i have a great
supplier and pricing.  I also believe the pricing is above and
beyong [*sic*] competitive to blow the competition away for
everyone.

Prices

10 - $70
25 - $125
50 - $250
100 - $450
250 - $900
500 - $1,500
1000 - $2,000
2500 - $4,000
5000 - $7,500
10000 pills - $10,000

**D.    Tablack's Arrest and the Execution of Search Warrants**

33.    On December 19, 2017, Tablack was charged by criminal

complaint in the District of New Jersey with conspiracy to distribute a

controlled substance analogue in violation of 21 U.S.C. § 846, and distribution

of a controlled substance analogue in violation of 21 U.S.C. §§ 841(a)(1),

841(b)(1)(A), and 813 (*United States v. Andrew Tablack*, Mag. No. 17-4186

(D.N.J.)).  On December 20, 2017, DEA agents arrested Tablack in the Central

District of California pursuant to an arrest warrant issued by the Honorable

Michael A. Hammer, United States Magistrate Judge, District of New Jersey.

34.    On December 20, 2017, law enforcement executed a search

warrant for Tablack's residence, a penthouse apartment in Beverly Hills,

California where Tablack's girlfriend Yuliya Brady also resided.  Law

enforcement recovered three one-kilogram packages containing a substance

suspected to be fentanyl and five one-pound packages of suspected marijuana

-11-

from the residence.  Law enforcement also found keys and a lease for safe deposit box no. 04223 at a Wells Fargo branch in Beverly Hills, California ("the Safe Deposit Box").

35.   On December 20, 2017, law enforcement executed a search warrant for the Van Nuys address, where they recovered approximately 25 kilograms of suspected fentanyl and multiple pill presses.  The execution of the search warrant in Van Nuys revealed that Tablack used that location to manufacture narcotics.

**E.   Overview of Tablack's Drug Activity**

36.   In or about 2013, Tablack began selling marijuana, including sales via the dark web.

37.   Beginning in or around February 2014 and continuing to in or around May 2015, Tablack sold drugs on Agora, an online marketplace on the dark web.  During this period, Tablack sold large quantities of marijuana, earning about $300 to $600 per pound.

38.   In or around May 2014, Tablack started to sell alprazolam by posting ads on Agora for Xanax tablets.

39.   Tablack generally charged 80 to 90 cents for one tablet of alprazolam.  Approximately 1,000 grams of alprazolam makes about 20,000 to 30,000 tablets.

40.   Tablack owned several pill presses that he initially used to manufacture alprazolam pills.  Tablack sometimes manufactured so many alprazolam pills that they would fill the bathtub in his residence.

41.     In or around August 2016, Tablack started selling fentanyl tablets on AlphaBay utilizing the moniker "Xanaxking2."  Fulfilling bulk orders for the fentanyl tablets, Tablack earned approximately $100,000 per month from his drug sales in 2016.

42.     By in or about 2017, Tablack increased his earnings from the unlawful sale of fentanyl tablets to approximately $120,000 per month.

43.     In addition to selling drugs via the dark web, Tablack would also sell directly to his customers.

44.     At various times, Tablack removed his sales platform from the dark web and sold directly to his customers.

45.     Individuals engaged in drug trafficking often put their property in the names of others in order to conceal and disguise the identity and extent of their assets.  Doing so helps traffickers conceal wealth that cannot be attributed to legitimate sources.

46.     Individuals engaged in drug trafficking often use friends, family members, and associates as nominees to hold title to or hold the assets derived from their drug proceeds.  Often, these proxies are individuals who have no prior criminal history.  Although the assets are held in the names of nominees, drug traffickers have dominion and control over the possession and use of the assets.

47.     Persons involved in drug trafficking who are aware of a criminal investigation into their drug or financial activities will commonly conceal,

liquidate, and transfer drug-derived assets in order to prevent law enforcement agencies from locating, identifying, seizing, and forfeiting these assets.

48.     Drug traffickers often maintain large amounts of U.S. currency on hand in order to maintain and finance their ongoing illegal activities, make purchases that cannot be traced to bank accounts or credit cards, pay bills, acquire assets, and make other purchases.

49.     Dealing in cash also serves to conceal the existence, location, nature, source, and control of money earned from unlawful activity by keeping it out of the banking system and avoiding taxation and reporting requirements.

## IV.  THE DEFENDANT PROPERTY

50.     Tablack purchased the defendants in rem using proceeds from the drug trafficking activity described above.

51.     The defendant property was purchased during the time period of Tablack's drug trafficking summarized in this Complaint.

52.     From the point when Tablack became involved in drug trafficking, in or about 2013, to the date of his arrest in December 2017, Tablack had no source of legitimate income.

53.     Andrew Tablack admitted to law enforcement that he was unemployed and had no legitimate employment from 2013 through 2017.

## A.     2015 Mercedes-Benz G63, VIN WOCYC7DF7FX238260

54.     In June 2015, Tablack bought a Mercedes-Benz SLS.  He paid for the car using $120,000 in drug proceeds and financing the balance of the purchase price (approximately $85,021.77).

-14-

55.     Tablack made the loan payments on the Mercedes-Benz SLS with proceeds from his drug trafficking summarized in this Complaint.

56.     Later in 2015, Tablack purchased a 2015 Mercedes-Benz G63, VIN WOCYC7DF7FX238260.  He paid for the defendant vehicle by trading in the Mercedes-Benz SLS and financing the balance with a loan from Mercedes-Benz Financial Services.

57.     Tablack made the loan payments on the defendant vehicle with proceeds from his drug trafficking summarized in this Complaint.

58.     The DEA seized the defendant vehicle and initiated administrative forfeiture proceedings against it.  On or about February 21, 2018, Mercedes-Benz Financial Services filed a claim to the defendant vehicle, alleging an ownership interest by virtue of a lien securing the unpaid balance of the loan extended to Tablack to finance a portion of the purchase price (approximately $50,000).

**B.     Items Found in the Safe Deposit Box**

59.     When executing the search warrant for the Safe Deposit Box, law enforcement found, among other things, approximately $219,750 in cash and the defendant jewelry.

60.     The cash in the Safe Deposit Box consisted of proceeds from Tablack's drug trafficking summarized in this Complaint.

61.     Between 2016 and 2017, Tablack purchased several expensive pieces of jewelry, including the defendant jewelry, and gave them to Yuliya Brady as gifts.

62.     Tablack purchased the defendant jewelry with proceeds from his drug trafficking summarized in this Complaint.

63.     The lease for the Safe Deposit Box identified Yuliya Brady's mother as the sole lessee.

64.     The address used on the lease was Tablack and Brady's residence. Brady's mother did not reside at that address.

65.     Brady accompanied her mother to Wells Fargo to help her open the Safe Deposit Box.

66.     During the course of their relationship, Tablack gave large sums of drug proceeds to Brady directly.  In 2016, when the relationship began, Tablack gave Brady between $10,000 and $20,000 per month.  In 2017, Tablack began to give Brady an additional $9,000 a month.

67.     In or around January 2017, Tablack and Brady had a physical altercation.  Brady sustained serious injuries.  During the same time period, Tablack gave Brady $100,000 in lump sum.

68.     Yuliya Brady admitted to law enforcement that she is unemployed. Brady claimed past employment as a contractor but never provided any documentation to support this assertion.

69.     The DEA initiated administrative forfeiture proceedings against the defendants in rem.  On or about March 22, 2018, Yuliya Brady filed a claim of ownership with the DEA contesting the forfeiture of the defendant jewelry and a portion of the defendant currency.

70.     In her claim, Yuliya Brady stated that she was the owner of the defendant jewelry and 75 percent of the defendant currency, or approximately $164,812.50 of the $219,750.00 seized.

## V.  CLAIM FOR FORFEITURE

71.     The allegations contained in paragraphs 1 through 70 of this Complaint are incorporated herein and made part hereof.

72.     As a result of the foregoing, the defendants in rem are subject to forfeiture to the United States of America pursuant to 21 U.S.C. § 881(a)(6) as moneys or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of Title 21, Subchapter I, of the United States Code; proceeds traceable to such an exchange; or moneys used or intended to be used to facilitate any violation of Title 21, Subchapter I, of the United States Code.

WHEREFORE, the United States of America requests that the Clerk of the Court issue a warrant for the arrest and seizure of the defendants in rem pursuant to Rule G(3)(b)(i) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure, which the plaintiff will execute upon the defendants in rem pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c); that notice of this action be given to all persons who reasonably appear to be potential claimants to the defendants in rem; that the defendants in rem be forfeited and condemned to the United States of America; that the plaintiff be awarded its costs and

disbursements in this action; and that the Court grant such other and further

relief it deems just and proper.

Dated:  Newark, New Jersey
          June 20, 2018

CRAIG CARPENITO
United States Attorney


_s/Kathleen Robeson_
By:  KATHLEEN ROBESON
Special Assistant U.S. Attorney

-18-

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | $219,750 in United States Currency, et al., Defendants in rem. |

**(b)**   County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)**   Attorneys *(Firm Name, Address, and Telephone Number)*
SAUSA Kathleen Robeson, United States Attorney's Office
970 Broad St., 7th Floor, Newark, NJ 07102
kathleen.robeson2@usdoj.gov  /  Tel. 973-645-2831

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                  *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☒ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
Another District
*(specify)*

☐ 6  Multidistrict
Litigation -
Transfer

☐ 8  Multidistrict
Litigation -
Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
21 U.S.C. § 881(a)(6)

Brief description of cause:
Forfeiture of property traceable to drug trafficking

## VII.  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:**     ☐ Yes   ☒ No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
06/20/2018

SIGNATURE OF ATTORNEY OF RECORD
s/Kathleen Robeson

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**

**$219,750 IN UNITED STATES CURRENCY;**

**ONE LADIES 18K WHITE GOLD NAIL DESIGN "JUSTE UN CLOU" DIAMOND BRACELET BY CARTIER, SERIAL NO. ANM732;**

**ONE 18K LADIES WHITE GOLD CARTIER "LOVE BRACELET," SERIAL NO. B60448016;**

**ONE LADIES 18K WHITE GOLD CARTIER "LOVE RING," SERIAL NO. B483400;**

**ONE 18K GOLD "ROYAL OAK" AUDEMARS PIGUET WATCH, SERIAL NO. 15451OR.ZZ.1256OR.01;**

**ONE LADIES STAINLESS STEEL "ROYAL OAK OFFSHORE" AUDEMARS PIGUET WATCH, SERIAL NO. 26048SK.ZZ.D002CA.01; and**

**ONE 2015 MERCEDES-BENZ G63 AMG, VIN WDCYCDF7FX238360,**

        *Defendants in rem.*

**Hon.**

**Civil Action No. 18-**

**WARRANT FOR ARREST**
*IN REM*

**TO ANY OFFICER OF THE UNITED STATES DEPARTMENT OF JUSTICE,
THE DRUG ENFORCEMENT ADMINISTRATION, AND/OR ANY OTHER
DULY AUTHORIZED LAW ENFORCEMENT OFFICER:**

WHEREAS, a Verified Complaint for Forfeiture *in Rem* has been filed on

June 20, 2018 in the United States District Court for the District of New

Jersey, alleging that the defendant property, namely $219,750.00 in United

States currency; one ladies 18k white gold nail design "Juste Un Clou"

diamond bracelet by Cartier, Serial No. ANM732; one 18k ladies white gold

Cartier "Love Bracelet," Serial No. B60448016;  one ladies 18k white gold

Cartier "Love Ring," Serial No. B483400; one 18k gold "Royal Oak" Audemars

Piguet watch, Serial No. 15451OR.ZZ.1256OR.01; one ladies stainless steel

"Royal Oak Offshore" Audemars Piguet watch, Serial No.

26048SK.ZZ.D002CA.01; and one 2015 Mercedes-Benz G63 AMG, VIN

WDCYCDF7FX238360, is subject to seizure and forfeiture to the United States

for the reasons set forth in the Complaint;

WHEREAS, the defendant property is currently in the possession,

custody, or control of the United States;

WHEREAS, in these circumstances, Rule G(3)(b)(i) of the Supplemental

Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Federal

Rules of Civil Procedure (the "Supplemental Rules"), directs the Clerk of the

Court to issue a Warrant for Arrest *in Rem* for the defendant property; and

WHEREAS, Rule G(3)(c)(i) of the Supplemental Rules provides that the

Warrant for Arrest *in Rem* must be delivered to a person or organization

authorized to execute it, who may be an agent with the United States

Department of Justice or any other United States officer or employee; someone under contract with the United States; or someone specially appointed by the court for that purpose.

YOU ARE, THEREFORE, HEREBY COMMANDED to take such steps as are necessary to arrest and detain the defendant property, including, if appropriate, serving a copy of this warrant on the custodian in whose possession, custody, or control the property is currently found; and

YOU ARE FURTHER COMMANDED to use whatever means may be appropriate to protect and maintain the defendant property in your custody until further order of this Court.

IN WITNESS WHEREOF, I, the Clerk of the United States District Court for the District of New Jersey, have caused the foregoing Warrant for Arrest *In Rem* to be issued pursuant to Rule G(3)(b)(i) of the Supplemental Rules.

Dated: _____        _____
                                                      Clerk of the Court


By:   _____
                                                      Deputy Clerk